Good morning. Scott Zarin for the Appellant General Components. May it please the Court. At the heart of this appeal is a device known as a Beaver's Cap and Plug, used to protect vacuum coupling removable fittings during their shipment. This device was designed by Ray McGarvey, founder and president of General Components, in 1993. In 1994, General Components began to sell these caps and plugs to semiconductor component manufacturers and distributors. Two years later, in 1996, the company entered an agreement with H.T. Components, under which H.T. would manufacture these caps and plugs. Before sending H.T. the designs of its Beaver's Caps and Plugs, however, General Components, as H.T. I'm having a little difficulty understanding you, but what was the evidence of applied materials approval of this cap? Ray McGarvey, the president of General Components Counsel, would you please slow down? We're having difficulty understanding. I know it's a stressful situation. If you could just slow down a little. Ray McGarvey, president of General Components, in his deposition testimony, and I believe in his declaration as well, stated that applied materials had informed him that it would, as of mid-1997, I believe, begin using his product, his caps and plugs, with its products. And his product is- That was the extent of the approval, that we will use your product? Yes. Yes. I suspect, Judge, that there's also formal approval in writing, but that is not part of the record, so his testimony is what we have in the record. Before sending H.T. the designs of its Beaver's Caps and Plugs, however, General Components asked H.T. to sign a proprietary products agreement in order to protect its design. After H.T. signed this agreement, Ray McGarvey sent Dan Topaz of H.T. Components his designs. Subsequently, Applied Materials, a large semiconductor manufacturer, approved these designs for use with its products, as I just discussed. This approval vastly increased the size of the market for McGarvey's products. In 1996, General Components sold approximately 100,000 units of the product to SynchroVac, a distributor of Applied Materials products. After Applied approved McGarvey's product for use with its product, another Applied distributor, NSYNC, began to purchase McGarvey's Beaver's Caps and Plugs in significant numbers. In mid-1997, however, NSYNC suddenly stopped purchasing the product and began instead to buy an identical product from H.T. Components. Your cause of action was breach of contract? It was. And what exactly are you saying was the breach? The breach, the proprietary products agreement, Judge. How was it breached? How was the agreement breached? It prohibited H.T. Components from selling, from producing and selling an identical cap and plug to the public. Now, H.T. Components then went and did that. It sold its product to NSYNC in violation of that agreement. But I must point out, Judge, that the district court did not rule on the issue of liability. So it immediately went to damages and said there had been no damages and, therefore, the assumption is that there was liability or it was going to permit the jury to deliberate on the question of liability. But assuming there was liability, there were no damages. Right. Assuming there was no liability, there was no damages. So said the court. What other products did your client produce? I'm looking for the established business for damages. The established business for damages would be, are these caps and plugs? I mean, there's no evidence in the record as to other products that General Components produced. We don't know whether General Components made anything else or not. Made any other products? We don't know, no. But we do know. They had an idea, a plan for a cap. Well, we do know that it produced these caps and plugs beginning in 1993, which was three and a half to four years prior to the production and sale of the product by NSYNC. And it hasn't had an established history by that time of selling these products. What was the evidence of damages introduced before the district court? The President of General Components, Ray McGarvey, produced charts of his sales, of his costs, over the previous two or three years. And he submitted that as evidence with his summary, opposition to the summary judgment motion. So that was going to be the measure of damages, the past sales? In his opposition, what he did was he said that he looked at NSYNC's sales over this period of time, you know, the pilfered sales by NSYNC. How much had he sold to NSYNC before this? There is no evidence in the record as to precisely how much he sold to NSYNC. But the district court found that from what evidence there was, that he hadn't sold to NSYNC. He was selling to other distributors. But this is precisely the point, Judge. NSYNC was — whether they were buying or not, he didn't know, did he? I mean, he was selling to distributors, not to NSYNC. He was not selling to NSYNC. He didn't get the so-called evidence that he had lost any specific number of sales to NSYNC. He had this $800,000 on his chart, but that was his estimate. Right. Well, Judge, there is no evidence in the record as to where he procured. Is that the problem? No, that's not the problem. And the point is that in Kids' Universe, the court said that you could use the past volume of sales as a predictive measure of the future volume of sales. So it didn't matter that he didn't have exact numbers as to how many products NSYNC itself sold. In the past, he did have numbers that he had sold, for example, 100,000 units of these products to a company called SyncroVac, which was another distributor of applied materials products. So under Kids' Universe, you could take that 100,000-unit sales number from 1996, and you could project into the future. Now, he didn't do that, Ray McGarvey, in his charts. He took NSYNC's numbers and inserted those into his chart, considering his costs and the costs. It's not necessary to do that. Under Kids' Universe, he could have used other numbers, those other numbers being previous sales to another distributor who purchased the product. So therefore, when the district court said that there was no evidence of the amount of sales that NSYNC made, it was an irrelevant point under Kids' Universe. But, counsel, wasn't there a declaration by the buyer from NSYNC that NSYNC was not going to purchase any more product from your client? There was. There was, Judge. But there was also evidence. There was also, I think, deposition testimony that that employee of NSYNC, whose name is Darryl Seaver, had a contradictory testimony, that, in fact, NSYNC did intend to continue to ---- Where is that contradictory testimony in the record? There is. There is testimony by an HT employee by the name of Emil Wertheimer who stated that NSYNC came to him and asked him if it was possible to reverse engineer these caps and plugs. But the question I have for you is where in the record was their contradictory testimony of Mr. Seaver? Well, it's not directly contradictory, Judge. It's evidence that a jury ---- from which a jury could find that Mr. Seaver was lying. About whether or not NSYNC intended to purchase? Yes, in July and August of 1997. And that testimony is the testimony of Mr. Wertheimer who said that he had indicated that they could, in fact, reverse engineer this product. What does reverse engineering have to do with the testimony of Mr. Seaver regarding whether or not there was intent to purchase in the future? Well, if NSYNC could reverse engineer this product, as Mr. Wertheimer testified, then ---- That would be consistent with not needing to purchase the item, wouldn't it? Well, it would be consistent with not needing to purchase, which is the point, being that if HT could produce this product, then NSYNC would no longer need to buy the product from General Components. So it first wanted to determine whether HT could do that. Now, only once it made that determination did it make its decision to cease buying the product from General Components and begin buying it from HT Components, allegedly because possibly it was less expensive. Wasn't NSYNC already a customer of the defendant for other products? And when the defendant showed up with these caps that were like the ones sold by the plaintiff, NSYNC started buying from the defendant. I don't know whether ---- Well, that's what the district judge said. Well, I'm not aware of any evidence in the record that NSYNC was a customer of HT Components for other products. But it would seem to me irrelevant regardless, Judge. It's on page 11 of the district judge's memo. I'm not certain exactly what you're referring to. Well, he said, I was just looking at the, even if GC directly sold to NSYNC in 1997, the fact that NSYNC purchased products from a vendor did not guarantee it would continue to do so. He hadn't found that they had ever purchased any. But he said even if, there was no evidence that they would continue to do so. And earlier he said that, who was CIFR? CIFR was the employee who indicated that the, that there would no longer be any purchases. CIFR was an NSYNC employee who indicated that they would no longer, that NSYNC would no longer purchase the products from General Components. And that was the testimony that was later indirectly contradicted by Wertheimer's testimony that HT, that NSYNC came to HT and asked whether they could reverse engineer this product. The implication being if it could be reverse engineered, we will then cease purchasing the product from General Components. And we will begin to purchase the product from HT Components. And it seems no coincidence to me, Judge, that it was exactly at the same time as HT, Wertheimer, told NSYNC that they could in fact reverse engineer the product, that NSYNC then ceased purchasing the product from General Components and began to purchase it from HT. Now a reasonable fact finder certainly could conclude that the only reason that, that the only reason for that attempt to discover whether reverse engineering were possible was to, was to cease the purchase from GC and begin purchasing from HT. What other reason could there be for the question? Did you want to save some time for rebuttal, counsel? Sure. Yes, I would like to reserve the balance of my time. All right. Thank you. Please proceed. Thank you, Your Honor. Good morning. May it please the Court, my name is Ivo Labar of Kerr and Wagstaff. This morning I'm appearing on behalf of the appellee, HT Components USA, Inc., also known as Hamlet. Your Honors, the issue before the Court today is whether the district court properly found that appellant General Components failed to point to specific facts showing lost net profits to a reasonable degree of certainty. The resolution of this issue begins and ends with the amended opposition to HT's summary judgment motion filed in the district court. The entire argument against granting summary judgment for HT in regards to the damage claim, the breach of contract lost profits damage claim, can be summed up as follows. General Components was selling to NSYNC, Systems, Inc., and thereafter Hamlet started selling to NSYNC. The only specific facts referenced in the opposition was that, those same facts, that General Components was selling, then they stopped selling, and Hamlet began selling. Fortunately, the undisputed evidence shows that lost profits cannot be shown with reasonable certainty, because the undisputed evidence shows that the one customer that General Components claims that it was going to sell to, NSYNC, was not going to do business with General Components after August of 1997. The declaration of Shannon Seiber, and Your Honor asked who was Mr. Seiber, Mr. Seiber was the top employee at NSYNC in charge of purchasing equipment and materials. Mr. Seiber's declaration makes it clear that he was not going to buy from General Components due to quality problems and other issues. Not only did Mr. Seiber state under oath that he was not going to buy from General Components anymore, Mr. Seiber also stated that General Components did not even try to sell any product to NSYNC after August of 1997. Your Honor, these undisputed facts are fatal to General Components' damages claim. The only reasonable inference that can be drawn from Seiber's under Mr. Seiber's undisputed declaration is that General Components would not have suffered any lost profit damages since it was not going to sell to NSYNC anymore. And since the sales to NSYNC was the sole basis for General Components' claim, its claim necessarily fails. Counsel, what's your response to opposing counsel's reference to the chart showing past sales? Your Honor, that's very interesting. This evidence, which was introduced for the first time on appeal, is very telling for what it shows and what it doesn't show. And we're not afraid of that evidence. We're ready to tackle it head on. In fact, in looking at this evidence, I was reminded of the commercial from the 1980s when I was growing up for Wendy's Fast Food Chain, the Where's the Beef commercial. Because even if you consider this evidence, you say to yourself, where is the beef? Let's look directly at each piece of evidence offered for the first time on appeal. First off, let me premise all these statements with it doesn't matter because the case was premised on sales to NSYNC. So if we look at past sales, we still had to have a customer to sell to in the future. The first piece of evidence is Excerpt of Record 75. It's a letter from Mr. McGarvey, the President of General Components, to his attorney and his expert in the case, the expert who never delivered the promised expert report. This letter states that Mr. McGarvey's theory on how to calculate damages, which is essentially take the sales that Hamlet made and make them mine. Mr. McGarvey states in that letter, quote, I can provide sales invoices and purchase orders to back up our figures, end quote. Tellingly, Mr. McGarvey didn't. And at the end of the letter, he concludes, quote, if there is a better way to do this, please let me know, end quote. Clearly, the law requires the best available evidence, and the best available evidence was not given here. Continuing on through this evidence, we get to Mr. McGarvey's worksheets. Mr. McGarvey's worksheets merely show a rote calculation of Hamlet sales versus what they would have sold. There's no explanation of how to derive net profits from these figures. There's no mention of past costs on past sales. Curiously, no mention of overhead, rent, salaries, et cetera. There's merely a gross revenue calculation that has been found to be insufficient under the case law, such as resort video. What's absent? There's no economic or financial data. There's no profit or loss statements. There's no balance sheet. There's no general ledger. There's no analysis of net profits, as I mentioned. There's no income statements. At the very best, giving all possible inferences to Mr. McGarvey, what we have is a rote calculation of gross revenue. That's insufficient to raise a tribal issue of fact as to net lost profits. Your Honor, continuing on, we know that the parties agree that the evidence of lost profits must not be speculative or uncertain. We know that lost profits must be reasonably certain as to both their occurrence and amount. All Mr. McGarvey has done here for the first time on appeal is make a showing of some amount of profits through a rote calculation. It's pure speculation to assume that Mr. McGarvey would have sold the same number of goods and types of goods that Hamlet did. This doesn't raise a tribal issue of fact as to cause or occurrence of lost profits. Nowhere in the record, and this is telling, does Mr. McGarvey state that he would have lost any certain orders, contracts, or commitments due to Hamlet's actions, and that's the key. Did Hamlet cause this damage? As a district court properly found, the answer is no. Your Honor asked a question about the impact of the applied approval. Let's look at that as well. For the first time on appeal, again, general components state that a large company, Applied Materials, who we've all heard of, was going to have approved the product and was going to start possibly purchasing it. Interestingly, though, if we look at the evidence in support of that argument, it's found in Excerpt of Record 11. It's just a letter from Mr. McGarvey to the president of the company, my client. In that letter, Mr. McGarvey mentions the applied materials approval, but he says, quote, they don't particularly recommend them, end quote. It's purely speculative to say that a company that didn't particularly recommend something was going to buy it in vast quantities. Nice catch. Thank you. Your Honors, I said that this case begins and ends with an analysis of the opposition motion in the district court. So let me return to that in conclusion. Virtually all of the evidence cited on appeal here was not specifically referenced in the district court. As we know, Federal Rule of Civil Procedure 56E requires specific facts to be raised in the opposition brief. This Court made that clear in the Carman decision. In Carman, the Court found, and I'll quote, a lawyer may easily show the judge in the opposition the evidence that wants to judge the read. The general components did not do that here. They do not really have a response to that, Your Honor, except for the citation to the Riverside case, Riverside v. Riverside 2. But that case is an opposite, Your Honor, because that case involved cross motions for summary judgment where the district court failed to read the defendant's, I'm sorry, the plaintiff's cross motion. That's not what happened here. And there's no inequity at all, Your Honor, in what happened here. The summary judgment proceedings was constituted in more than 30 docket entries, more than 30 docket entries on the district court. General components filed an opposition. It filed an amended opposition. It filed supplemental declarations. The summary judgment proceedings were subject to three hearings. General components had ample opportunity to bring this evidence to the court's attention earlier, the district court's attention. And, Your Honor, as I pointed out today, I believe even if it did, it wouldn't have mattered. General components cannot show net loss profits with reasonable certainty. Thank you. Unless Your Honor has any questions, I respectfully request the Court affirm the district court's ruling. Thank you, counsel. Rebuttal. Yes, Judge. First, I'd like to say that what HD Components does here is it attempts to raise the bar significantly. It attempts to redefine the term reasonable certainty to mean absolute certainty. By saying that simply because Ray McGarvey did not submit exact sales figures of future sales figures, it cannot show reasonable certainty. But, counsel, as I understand his argument, his argument is the only prospective buyer in sync stated that it did not intend to buy from your client, and that's why the evidence was not persuasive. Well, that's not true, Judge. There were several prospective buyers. I mean, the gravamen of my argument is that you could take past sales and project them into the future. Now, the past sales that we reference as most important in this case were the 100,000 units sold to SyncroVac, not to NSYNC. Now, SyncroVac was another purchaser, another distributor that distributed applied materials products, and those sales, those 100,000 1996 sales were certain to increase after applied materials approved the product for use with them. Okay. Why didn't you? What interfered with that? Are you saying that because HT started to manufacture the product that there was no longer any reason to sell to the past customer? I don't understand that argument. No, no. There is no evidence in the record that general components ceased selling to these past customers. In fact, they still do to a number of them, one of those being SyncroVac, and others --. Why didn't they still sell to those customers? Because they, as a consequence of this lawsuit and a consequence of HT components besmirching the reputation essentially of general components, they lost additional sales from SyncroVac and a number of other potential buyers that never materialized as a consequence of what HT did. Counsel, you brought the lawsuit. The problem is NSYNC quitting to buy. Now, that word gets out. So how do you connect the cause with damages? How do you connect some breach here with your damages that you proved? Well, first, Rambogarby in his deposition testimony testifies that as a consequence of this particular action and behavior by HT, they were lost sales. In a general sense, granted, but he does testify to that effect. Second, it's perfectly plausible that if word gets out in the marketplace that one major purchaser, i.e., NSYNC, ceases to purchase a product, other potential purchasers would think, hey, I'm not going to purchase these products either because there must be a reason that the other potential purchaser, NSYNC, ceased to purchase. We don't know what the reasons are. There is no deposition testimony in the record of those potential other customers. There were, Judge, once again, other customers in addition to SyncroVac who purchased 100,000 units in 1996. I have the names of those here. Thailand Brooks Engineering being two others. Well, what's bothering me is that I don't see a fact issue on whether or not NSYNC was going to stop buying. And that's what apparently you not only lost but hurt your reputation. Now, I don't see a fact issue on whether or not you can continue to sell to NSYNC. Well, Judge, as I said before, the testimony of Mr. Wertheimer of HT that Daryl Siever, I mean, I'm sorry, of that NSYNC came to them and said, can you reverse engineer this product, indirectly contradicts the testimony of Mr. Siever that they would continue to, they would discontinue purchasing those products nevertheless. All right, counsel. Thank you very much for your argument. Thank you. Thank you to both counsel for your argument. The case just argued is submitted for decision by the court.
judges: Goodwin, Reavley , Rawlinson